JOHNSTON SALES COMPANY, Appellant,

v.

Henry LIZANA, d/b/a Johnny's Garage, Appellee.

No. 5346.

Court of Civil Appeals of Texas, Waco.

July 25, 1974.

Rehearing Denied Aug. 22, 1974.

Peter N. Plumb, San Antonio, for appellant.

Eugene B. Sisk, Universal City, Groce, Locke & Hebdon (James D. Guess) (Thomas H. Crofts, Jr.), San Antonio, for appellee.

## OPINION

JAMES, Justice.

In this case, upon Defendant-Appellee's Motion, the trial court disregarded six of the jury's answers to special issues and entered a judgment that Plaintiff-Appellant Johnston Sales Company take nothing against Defendant-Appellee Henry Lizana. We reverse the trial court's judgment and render judgment in favor of Plaintiff-Appellant in accordance with the jury's verdict.

This action arose as a result of a tractor-trailer collision with a bridge on or about November 28, 1970 on Farm to Maret Road 78 in the outskirts of Cibolo, Texas, in Guadalupe County. Cibolo is located between San Antonio and Seguin, Texas. Plaintiff-Appellant Johnston Sales Company, a corporation, alleged that it was the owner of the tractor-trailer rig in question; and sued Defendant-Appellee Henry Lizana doing business as Johnny's Garage for the loss in market value of the trailer, cost of repairs to the tractor and value of the loss of use of the tractor while undergoing repairs. It was Plaintiff-Appellant's position that on the occasion in question Defendant-Appellee Lizana committed certain acts of negligence in connection with the operation and parking of his wrecker-truck on the paved portion of the highway on which the subject bridge was located, which conduct proximately caused Plaintiff-Appellant's tractor-trailer rig to collide with the bridge. Defendant-Appellee in his pleadings charged Arturo Garza, the driver of Plaintiff-Appellant's rig, with certain acts of contributory negligence.

Trial was had to a jury, which made findings in response to the following respectively-numbered special issues which are pertinent to this decision, to wit:

(1.) That on the occasion in question Defendant Lizana parked his wrecker on the paved part of the highway;

(2.) That such parking was negligence, and

(3.) A proximate cause of the collision;

(6.) That on the occasion in question Defendant Lizana parked his wrecker vehicle at a location so as to obstruct traffic approaching San Antonio from Seguin on the subject highway;

(7.) That such parking was negligence, and

(8.) A proximate cause of the collision;

(8A.) That at the time of the accident the trailer in question was the property of Plaintiff Johnston Sales Company;

(9.) That immediately before the accident the trailer had a market value of $10,000.00;

(10.) That immediately after the accident the trailer had a market value of $1500.00;

(10A.) That at the time of the accident the tractor was the property of Plaintiff Johnston Sales Company;

(11.) The cost of repairs for the tractor was $800.00;

(12.) The value of the loss of use of the tractor while undergoing repairs was $500.00.

Special issues 13 through 20 dealt with the problem of whether or not Plaintiff's driver, Arturo Garza, was guilty of con-

tributory negligence. The jury failed to find Garza guilty of any contributory negligence.

Thereafter, Defendant-Appellee filed a Motion requesting the trial court to disregard the jury's answers to Special Issues 8A and 10A (finding Plaintiff-Appellant to be the owner of the tractor and trailer), 9 and 10 (the reduction in the market value of the trailer), 11 (cost of repairs of the tractor), and 12 (value of the loss of use of the tractor). Said motion alleged that there was no evidence to support the jury's findings to said special issues. Upon hearing, the trial court granted such motion; and entered judgment that Plaintiff-Appellant Johnston Sales Company take nothing against Defendant-Appellee Lizana, from which Plaintiff-Appellant appeals. We reverse the trial court's judgment and render judgment in favor of Appellant against Appellee in accordance with the jury verdict.

█ To sustain the action of the trial court in granting the motion to disregard the six special issues in question, it must be determined that there is no evidence on which the jury could have made the findings in answer to such special issues. Rule 301, Texas Rules of Civil Procedure; Burt v. Lochausen (Tex.Sup.Ct.1952) 151 Tex. 289, 249 S.W.2d 194; Leyva v. Pacheco (Tex.Sup.Ct.1962) 163 Tex. 638, 358 S.W. 2d 547. In acting upon such motion all testimony must be considered in a light most favorable to the party against whom the motion is sought (here, the Plaintiff-Appellant), and every reasonable intendment deducible from the evidence is to be indulged in such party's favor. Burt v. Lochausen and Leyva v. Pacheco, both cited above.

By examining Plaintiff-Appellant's evidence in its most favorable light it is our opinion that the trial court erred in disregarding the six special issues in question on the ground of no evidence to support such findings. Indeed, we not only find the existence of some evidence to support such findings, but also that there is substantial and factually sufficient evidence to support such findings.

Appellant's eight points of error complain of the trial court's sustaining of Defendant-Appellee's motion to disregard the six jury findings and entering the judgment in favor of Defendant, asserting that there was not only evidence, but factually sufficient evidence to support the jury's findings that the tractor and trailer were the property of Plaintiff, of the market value of the trailer before and after the accident, of the cost of repairs to the tractor, and the value of the loss of use of the tractor. We sustain these contentions.

Since Defendant-Appellee has by cross-points raised the question as to the factual insufficiency of the evidence supporting the jury's findings not only to the six special issues above-mentioned, but also as to other jury findings, as more particularly hereinafter pointed out, we will review the evidence of all the special issues in question, both from legal sufficiency and factual sufficiency standpoints.

█ Let us first review the evidence bearing upon the jury's answers to Special Issues 8A and 10A, wherein the jury found the tractor and trailer to be the property of Plaintiff Johnston Sales Company at the time of the accident.

Arthur L. Johnston testified that he was the president of Johnston Sales Company, Plaintiff-Appellant herein. Johnston Sales Company was a corporation owned 51% by Johnston Elevator and Storage Company and 49% by Arthur L. Johnston, his wife, and his daughter. Johnston Elevator and Storage Company was a family corporation wholly owned by Arthur L. Johnston, his wife and daughter. In other words, Johnston Elevator and Storage Company was the "parent corporation" and had control over Johnston Sales Company, and both were family corporations. Likewise Arthur L. Johnston, together with his father and his two sisters, owned still another

corporation, the A. L. Johnston Grain Company. All three corporations headquartered in Seguin, Texas. Johnston Sales Company was in the business of buying and selling grain, purchasing grain from the farmers, storing it in the Johnston Elevator and Storage Company grain elevators, and then taking it out of these elevators and hauling and selling the grain in different parts of the country. Johnston Sales Company owned several tractor-trailer rigs which were used to haul the grain, and its operations ranged from the Rio Grande Valley in the South as far North as Minnesota and as far east as Florida.

Mr. Johnston testified that at the time of the accident, Johnston Sales Company owned approximately ten tractors and nine trailers, including the tractor-trailer rig involved in the subject accident. He stated he was personally familiar with the particular tractor-trailer involved in the collision with the bridge, and described each of them in particular. The tractor was a 1965 International which was diesel powered and was 250 horsepower. He made a mistake when he first described the trailer as a 1965 Fruehof; however, he later corrected himself to say the trailer in question was a 1965 Trail-Mobile, and was forty feet long, of aluminum construction and completely insulated and refrigerated. He testified both on direct and cross-examination that the tractor and trailer belonged to and were the property of Johnston Sales Company, and had been such for about four years. This testimony was clear and unambiguous, and in response to pointed questions on direct examination, and to questions on cross-examination which were calculated to encourage Mr. Johnston to say the tractor and trailer actually belonged to Johnston Elevator and Storage Company.

Defendant-Appellee offered into evidence Johnston's copies of the corporate income tax returns for a three-year period, to wit, for 1969, 1970, and 1971, of Johnston Sales Company, each of which showed Johnston Sales Company to have no assets, no income, and no deductions. Defendant-Appellee also offered in evidence copies of the 1969, 1970, and 1971 corporate income tax returns of Johnston Elevator and Storage Company, which showed assets, income, and deductions. Defendant-Appellee contended from these returns that Johnston Sales Company was really nothing but a corporate shell and was not a "viable" corporation; and therefore Johnston Sales Company could not possibly be the owner of any tractors and trailers, including the tractor and trailer in controversy. On the other hand, Mr. Johnston testified that each year the income tax return of Johnston Elevator and Storage Company included all the operations of Johnston Sales Company. In effect he testified that he had his accountants handle the returns in this manner for convenience, particularly since both corporations were family corporations owned in effect solely by himself, his wife and daughter. Plaintiff-Appellant offered proof that Johnston Sales Company paid a corporate franchise tax, had accounts payable, kept detailed records of expenses incident to hauling operations, and had an active bank checking account. Moreover, proof was made of a renewal note owed to Nolte National Bank executed by "Arthur L. Johnston, d/b/a Johnston Sales Company," which was secured by the trailer which was involved in the accident. From this state of the record, we find the evidence to be legally and factually sufficient to support the jury's findings that Johnston Sales Company was the owner of the tractor and trailer at the time of the accident.

■ We next consider the jury's answers to Special Issues 9 and 10, wherein the jury found the market value of the trailer to be $10,000.00 immediately before the accident and $1500.00 immediately after the accident. It is undisputed that the trailer was completely severed into two parts as a result of the accident, and was a total loss except for scrap value of the aluminum contained therein. The only testi-

mony in the record concerning these values is that of Arthur L. Johnston, who testified he had been in the business of using tractor-trailer rigs for twelve to fourteen years, and during this time he had had occasion to buy and sell trailers and tractor-trailer rigs, and that he was familiar with the cash market value of trailers in Guadalupe County, including the one involved in the accident. He testified that when he bought the trailer he paid "nine or ten" thousand dollars for it, and thereafter installed a new Thermo-King refrigeration unit on it which cost $5400.00. He first testified that the cash market value of the trailer in Guadalupe County immediately before the accident was $10,000.00, and after the accident the trailer had no market value except for aluminum scrap value which was $300.00. Thereafter in his testimony Johnston testified that the $10,000.-00 market value figure he had given earlier was a "low estimate" and that in his opinion the cash market value immediately prior to the collision was approximately $12,000.00 to $13,000.00. There is no other testimony in the record concerning the market value of the trailer except that of Mr. Johnston. Certainly this evidence is legally and factually sufficient to support the jury's answers to Special Issues 9 and 10.

■ We next review the evidence concerning the jury's answer to Special Issue No. 11, wherein the jury found $800.00 to be the cost of repairing the tractor. Here again all the testimony is that of Arthur L. Johnston which is uncontradicted. He testified that the tractor sustained frame damage in the accident, and that the cost of repairs was "about $800.00." The shop and employees who did the work belonged to A. L. Johnston Grain Company, and Johnston Sales Company did hauling services for A. L. Johnston Grain Company to pay for the repair work. The tractor was in the shop about sixty days; however, actual repair work was done on the tractor for about two weeks in all. A charge of $10.80 per hour was made for the labor,

and no claim was made for tools, equipment or shop expense other than labor. Johnston testified that if the tractor had been "outside work" (other than for Johnston Sales Company) it would have cost "three or four times that much." Additionally, Johnston's answer to a written interrogatory was read into the record, wherein he was asked about the exact cost of repairs to the tractor, and his answer was: "Straighten frame $396.45. New fifth wheel holland 2000 C 36, $247.40 and sliding fifth wheel plate, $178.65—total exact cost of repairs to tractor." These items add up to $822.50. This evidence is ample to support the jury's answer to Special Issue No. 11 of $800.00.

■ To Special Issue No. 12, the jury found $500.00 to be the reasonable value of loss of use of the tractor during the time it was undergoing repairs. The only testimony bearing on this issue was that of Arthur L. Johnston, who testified the tractor-trailer unit made a gross income of $200.00 per day, out of which it earned a net income of $150.00 per day. As stated above, the tractor was in the shop approximately sixty days before repairs were completed; however, repair work actually performed on the tractor amounted to two weeks, although this work was spread out during the sixty-day period. A tractor is part of a tractor-trailer unit—useless is one without the other. Considering the customary daily earning rate of the tractor-trailer unit of $150.00 per day prior to the accident, and the length of time required to get the tractor put back in operating condition; we believe the $500.00 finding by the jury of the loss of use of the tractor during a reasonable time for repairs is well within the range of the testimony. The evidence is legally and factually sufficient to support the jury's finding thereto.

■ Appellee by his cross-points has attacked the legal and factual sufficiency of the evidence to support the jury's findings to Special Issues 1, 2, 3, 6, 7, and 8, where-

in the jury found Defendant-Appellee Lizana guilty of two acts of negligent conduct, each of which was a proximate cause of the collision in question. As stated before, the jury found:

(1.) Defendant Lizana parked his wrecker on the paved part of the highway;

(2.) Which parking was negligence; and

(3.) A proximate cause of the accident; and

(6.) Defendant Lizana parked his wrecker at a location so as to obstruct traffic approaching San Antonio from Seguin;

(7.) Which parking was negligence; and

(8.) A proximate cause of the accident.

We have carefully reviewed the record, and find the evidence to be legally and factually sufficient to support the jury's findings to these six issues.

As stated above, this accident happened about 7:00 A.M., or shortly thereafter, on November 28, 1970, on Farm to Market Highway 78, a two-lane paved road, between Seguin, Texas, and San Antonio, Texas, in the eastern outskirts of Cibolo, Texas. It was extremely foggy that morning, and visibility was severely restricted. The highway was wet, and the shoulders and bar ditches were muddy. As one approaches Cibolo from the east, the highway runs in a general westerly direction across a concrete bridge which is 117 feet in length, with guard rails fifty feet long on each end of the bridge. As one goes on into Cibolo, about 150 feet West of the West guard rail of the bridge the highway makes a rather sharp turn of about 30 degrees to the left or in a southwesterly direction. There is a large sign with an arrow on it marking and pointing out the curve located 150 feet from the West end of the West guard rail of the bridge. About 168 feet beyond the large arrow sign on the same side of the highway is a small "35 mile per hour" speed limit sign. It was across this bridge that Arturo Garza was driving Plaintiff-Appellant's tractor-trailer rig in a Westerly direction on his way to San Antonio when the accident occurred. Garza had been travelling 40 to 45 miles per hour before he reached the bridge and had reduced his speed slightly as he got on the bridge. Garza's home was about five miles from the scene of the accident, and he had been over this route many times and was familiar with this road, including the curve to his left. As he approached the bridge, Garza saw a blue light in his lane of traffic directly ahead of him, about 250 or 300 feet away. He was very emphatic to state the blue light was in his lane of traffic and "straight ahead" of him. He could also see what appeared to him to be a pair of headlights pointed in a downward direction and "kind of my way." The blue light and the headlights were all he could see of any vehicle that might be on the highway. Seeing this, he applied his hand air brakes, whereupon the rear tandem of the trailer "grabbed the bridge," and he saw "half the trailer going in behind" him. Since the trailer was cut completely in two, the part of the trailer attached to the tractor fell down and hit the pavement, which forced Garza to a stop. When he came to a halt he could see the vehicle ahead of him which had the lights he had seen. When asked where the vehicle was located, Garza marked its location on a photograph showing it to be in front of the large "arrow" sign (above referred to), in his (Garza's) lane of traffic, with the right front wheel and the two rear wheels on the pavement, and only the left front wheel off the pavement. This vehicle which he later learned was the Defendant's wrecker truck, was headed generally in a Northerly direction, and was "located just in front of some sort of car in the ditch," on Garza's right hand side of the road, and was tilted downward toward the ditch. When he came to a halt, Garza saw himself "right in the middle of the bridge." He tried to move his tractor, but could not do so be-

cause of the dragging of the front half of the trailer, as well as the fuel tank of his tractor. So he got out to "run to the man on the wrecker," when he heard another wreck behind him. He turned to see if any people behind him were hurt. The car behind Garza had come to a safe stop, then a panel truck rearended this car, and then a 1955 Ford car in turn struck the panel truck in the rear. After checking on the people behind him, Garza then went back to the Defendant's wrecker truck. The Defendant told Garza he was checking on that car in the ditch. The Defendant told Garza "he was busy that morning, had three or four wrecks, and he was checking on that one."

The Defendant Henry Lizana operated a wrecker business known as Johnny's Garage in Universal City and his home was three miles from the scene of the accident. Lizana testified he got a call at his home about 7 A.M., on the day of the accident from the City Marshal of Cibolo, telling him of an accident at Cibolo. The Marshal did not tell him exactly where the accident was, but said it was on Highway 78 at Cibolo. Lizana.got in one of his wrecker trucks and drove on Highway 78 into Cibolo, approaching Cibolo from the West, and there in the town he found an accident. He stopped to see if they needed help, whereupon he was told that no help was needed there, but that there was a car in the ditch near the West end of the bridge on Highway 78 on the East side of Cibolo. Thinking this might be the accident the City Marshal had called him about, Lizana proceeded to this car in the ditch about which he had been told. As he proceeded out Highway 78 from Cibolo towards the bridge hereinabove referred to, he saw a car in the ditch on his left on the Cibolo side of the large arrow sign at the curve. Lizana testified that he parked his wrecker entirely off the paved portion of the road about one yard past (or to his right of) the small 35 mile per hour speed sign hereinabove referred to. In this area the bar ditch sloped off gradually; whereas down

by the large arrow sign at the curve where the car in the ditch was located, the bar ditch sloped downward more abruptly. He said he turned on his rotating blue beacon light, his four-way flasher lights, and his parking lights, and turned his headlights off. He then took his flashlight and walked down to the car in the ditch to see if anybody was in it. He said the car in the ditch was about 15 yards from his wrecker truck. He saw there was no person in or around the car, and then walked back to his wrecker, and was getting into his truck when he heard this "terrible noise down there, which later on I learned to be this tractor trailer truck had hit" the bridge. He said after he heard this loud noise that it was so extremely foggy he could not see, and did not know what had happened, but assumed it was an accident. He said he had not moved his wrecker (from its parked position off the pavement) until he saw the headlights and bare outlines of the tractor come to a stop about 85 yards away from him. This was all he could see from this distance on account of the extreme fog. At this point he said he backed his wrecker from where he had parked it, back up on the road and pulled down a short distance on the pavement in the direction of the tractor and then stopped on the pavement. He asked the driver of the tractor if he was hurt, and the driver replied that he was not; whereupon, at this moment he heard "a lot of other commotion, just one right after the other," which to him "sounded like a lot of vehicles was all banged up back there." So then he drove back into Cibolo to find the City Marshal, and then returned to the scene shortly thereafter with the City Marshal.

Arthur L. Johnston testified that he arrived at the scene of the accident shortly after it happened; that he made a detailed inspection of the shoulder and bar ditch of the road between the bridge and the 35 mile per hour speed limit sign, for the purpose of determining if there were any tire marks leading off or on the highway; that the ground was wet all along the shoulder

and bar ditch so that the soft caliche and mud would "gum up on your shoes"; that the surface of the ground around the 35 miles per hour sign and the large arrow sign was such that when you walked it would leave a footprint: that he found no tire marks of any kind anywhere on the shoulder or in the bar ditch from the bridge on up around either side of the 35 miles per hour speed limit sign.

Likewise, A. M. Luna, another wrecker driver, arrived at the scene before 8 A.M., and walked with Arthur L. Johnston from the bridge up past the large arrow sign and on up past the 35 miles per hour sign, looking for tire marks on the shoulder and in the bar ditch, and he (Luna) likewise testified that there were no tire marks anywhere along there. Luna said the ground was such that if a truck had been pulled off the pavement and then backed up on the pavement (as Lizana testified he did) that the truck would have left tire marks.

On the other hand the City Marshal, Edward Higginson, testified that he examined the scene as he came there with Lizana, and that there were dual wheel tire marks or tracks on the shoulder and in the bar ditch "about 15 or 20 feet east of the 35 mile an hour speed limit sign," and also muddy tire marks on the pavement.

Several photographs of the scene were in evidence, including one which was taken from the bridge in the right lane going West looking Westward toward the large arrow sign and showing the curve in the road to the left, as well as the 35 miles per hour speed limit sign. In other words, this picture was shot from about where Garza was when he first saw the rotating blue light of Lizana's wrecker. If Lizana had actually parked his truck off the road near the 35 miles an hour sign as he testified he did, it could not have been located "straight ahead" of Garza on Garza's side of the highway. The wrecker would have been so far around the curve that Garza could not have been able to tell whether it was in his lane of traffic or not.

From this state of the record, we see that the evidence is conflicting; however, the jury resolved these conflicts in favor of Plaintiff-Appellant. We find the evidence supporting the jury's answers to Special Issues 1, 2, 3, 6, 7, and 8, as well as the six special issues disregarded by the trial court, to be legally and factually sufficient.

We hold that the trial court erred in disregarding the six special issues in question (8A, 10A, 9, 10, 11 and 12) and in entering judgment in favor of Defendant-Appellee. Accordingly, we reverse the trial court's judgment and render judgment in favor of Plaintiff-Appellant Johnston Sales Company against Defendant-Appellee Henry Lizana in the amount of $9800.00 in accordance with the jury verdict. Costs in the trial court, as well as costs of appeal, are taxed against Defendant-Appellee.

Reversed and rendered.